**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF ROBERTO GONZALEZ, by<br>MARTHA HENRIQUEZ, Administrator, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 07 C 18 |
| | ) | |
| CITY OF WAUKEGAN, and Waukegan | ) | Judge Rebecca R. Pallmeyer |
| Police Officers MICHAEL NEWMAN, | ) | |
| STEVEN HOLLISTER, ROBERT | ) | |
| KERKORIAN, MARK STURTEVANT, | ) | |
| ED HEIDLER, ALEJOS VILLALOBOS, | ) | |
| ELIAS AGLIANOS, SCOTT THOMAS, | ) | |
| ANTHONY JOSEPH, DEVIN ROUSH | ) | |
| and WAYNE WALLES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On the night of January 3, 2006, Roberto Gonzalez began speaking incoherently and acting strangely. He brandished a large kitchen knife and then barricaded himself alone inside a small pantry in his family's home in the City of Waukegan. A family member called 9-1-1, and Waukegan police officers promptly arrived on the scene. They were unable to talk Gonzalez out of the pantry, however and, after a standoff, police officers fired several rounds of a pepper spray into the barricaded pantry and forcibly kicked down the door. Once inside the pantry, officers pinned Gonzalez against a wall with a protective police shield and shocked him multiple times with a taser gun. Soon after officers wrestled Gonzalez to the ground and placed him in handcuffs, Gonzalez lost consciousness. Several minutes later, despite officers' attempts at resuscitation, Gonzalez was dead. The medical examiner attributed Gonzalez's death to "excited delirium due to cocaine intoxication," but observed that "[s]tress due to restraint is considered a significant contributing factor to the death."

Martha Henriquez, the administrator of her brother Roberto Gonzalez's estate, brings this

action against the officers involved, alleging use of excessive force in violation of the Fourth Amendment and tortious assault and battery under state law. Henriquez also sued the City of Waukegan under a *respondeat superior* theory on the estate's state law claims. The officers contend that they acted reasonably and are entitled to qualified immunity from liability on the federal claims. Both the City and the individual officers move for summary judgment. For the reasons explained below, the City's motion is denied and the individual Defendants' motion is granted in part and denied in part.

## BACKGROUND

As this case is before the court on Defendants' motions for summary judgment, the court views the facts and draws all reasonable inferences that flow from them in the light most favorable to Plaintiff, as the nonmoving party. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

On the night of January 3, 2006, Roberto Gonzalez was inside his home in the city of Waukegan, Illinois, when he began acting out. Roberto's brother, Jose Gonzalez, testified that Roberto had been drinking alcohol and was "getting out of hand." (Gonzalez Dep. at 26:19-20.) Roberto—who was 34 years old and weighed close to 240 pounds—was mumbling incoherently, slurring his speech, and brandishing a large kitchen knife. (*Id.* at 27:9-12; 32:1-3.) Even so, Jose said, Roberto wasn't physically aggressive toward any of the other people gathered in the home. (*Id.* at 27:15-20.) Jose tried to calm his brother down, and ultimately succeeded in knocking the knife from Roberto's hand as Roberto stood in the doorway between the home's kitchen and a small pantry. (*Id.* at 29:5-24.) Roberto then withdrew into the pantry, closed the door, and barricaded himself inside alone. (*Id.* at 29:13-23; 30:21-24.) Jose attempted to force the pantry door, but was unable to get it open. (*Id.* at 22:7-23.) Yolanda Centeno, Roberto's sister, was in the kitchen when Roberto shut himself in the pantry. She heard, but she did not see, Jose knock the knife from Roberto's hand. (Centeno Dep. at 23:13-22.) The record does not indicate where the knife ultimately came to rest, and it is not clear whether it landed on the floor inside the pantry door,

where Roberto could have retrieved it, or fell harmlessly out of Roberto's reach onto the kitchen floor.

After Roberto shut himself inside the pantry, Centeno heard Roberto making noises and shouting things like "leave me alone, leave my family alone." (*Id.* at 20:2-8.) Centeno testified that it was difficult to make out what Roberto was saying because some of his statements were nonsensical. (*Id.*) Centeno believed Roberto was hallucinating, so she called 9-1-1 and requested an ambulance. (*Id.* at 24:8-14.) The record does not indicate precisely when Centeno placed the emergency call, but Centeno testified that it was some time after approximately 11:00 p.m. (*Id.* at at 16:2-19:15.) The emergency operator told Centeno that police officers had been dispatched to the house. (*Id.* at 25:9-18.) When Jose, who was standing near the phone, heard that police were en route he told Centeno, "I don't want no police officer. I need an ambulance." (*Id.* at 25:9-24.)[1] It is unclear whether Centeno relayed this request to the emergency operator, but Waukegan police officers did, in fact, arrive at the residence before Centeno hung up with the emergency operator. (*Id.)* The record does not indicate when an ambulance or medical personnel arrived at the Gonzalez residence, but paramedics were present during at least some of the ensuing events.

Sergeant Charlie Burleson of the Waukegan Police Department was the shift supervisor at the time that the emergency call was received. (Burleson Dep. at 9:5-13.) When Ms. Burleson, who was the second officer on the scene, arrived, Roberto was still barricaded in the pantry. (*Id.* at 10:4-7.) According to Burleson, she spoke first with Jose, who told her that he had struck Roberto in the head during a struggle before Roberto went into the pantry. Burleson testified that Jose expressed concern because Roberto's head was bleeding. (*Id.* at 10:10-14.) According to

---

[1]  The court relies on Centeno's testimony at this point because, while Defendants have submitted excerpts of Jose Gonzalez's deposition testimony, his entire deposition is not in the record before the court.

Burleson, Jose also said that Roberto "was going crazy" and that Roberto had been "threatening [his family] with a knife." (*Id.*)

Jose's account of his interactions with police does not include the conversation that Burleson describes. (Pl.'s 56.1 Resp. ¶ 26.)[2] Jose testified that one of the first police officers to enter the house had his gun drawn. (Gonzalez Dep. at 38:1-3.) Jose told the officer to put the gun away and said, "my brother's not armed." (*Id.* at 38:13-17.) A female police officer (Plaintiff contends this was likely Burleson) reassured Jose: "Don't worry. We're not going to harm your brother. We're going to get him under control. We're going to take him to [a nearby hospital]." (*Id.* at 38:18-39:22.) Jose was then escorted from the house by police. (*Id.*)

Sergeant Burleson testified that, based on Jose's report that Roberto was apparently unstable and armed with a knife, she ordered the officers present to "secure the scene" by removing the rest of the family from the house. (Burleson Dep. at 11:16-23.) Burleson, who is also a specially-trained hostage negotiator, then attempted to establish a dialogue with Roberto by asking him questions through the pantry door. (*Id.* at 14:15-24.) Roberto made several comments, not all of which were responsive to Burleson's questions. (*Id.* at 13:4-23.) Burleson asked if Roberto was hurt, to which Roberto responded, "No, no, no." (*Id.* at 13:14-15.) When Burleson told Roberto that the police were there to assist him, Roberto made reference to an apparent hallucination; he told her, "the bad people are here, the bad people, the bad people, the demons." (*Id.* at 13:16-18.) Burleson asked Roberto whether he had a knife, and Roberto responded "no," but Roberto then said the word "stick" for no apparent reason. (*Id.* at 13:19-20.) Burleson asked Roberto if he was bleeding, and Roberto again said "no." (*Id.* at 13:20-21.) Burleson urged

---

[2]     Again, only portions of Jose Gonzalez's deposition are in the record, and those portions do not contain direct questions about whether Jose actually made the statements Burleson attributes to him. The testimony in the record does, however, contain Jose's account of an exchange that he had with the initial officers on the scene, including a female police officer who Plaintiff asserts was Burleson. Plaintiff points to that testimony in the Rule 56.1 Statement as its basis for denying the truth of Burleson's account.

Roberto to come out of the pantry and talk face-to-face, but Roberto refused and, according to Burleson, began thrashing frantically and making noises "as if he was speaking in tongues, just a lot of, you know, kind of gibberish that you couldn't understand." (*Id.* at 13:21-14:2.) This continued for some time–Burleson was not sure exactly how long–mixed with intervals of silence. (*Id.* at 14:3-14.) At points, Burleson could also hear "what appeared to be whimpering." (*Id.* at 14:10-11.) Burleson continued attempting to communicate with Roberto, while the "Rapid Response Team"—the Waukegan Police Department's version of a SWAT Team—took up positions in the kitchen and outside of the house. (*Id.* at 19:22-24.) The record does not indicate exactly how long the standoff lasted, but the accounts of the various officers involved suggest that the entire incident lasted no longer than one or two hours. By 1:00 a.m. that night, members of the Lake County Major Crime Task Force had been dispatched to the scene to begin an investigation into Roberto's death. (Investigative Report, Ex. B to Pl.'s 56.1 Stat.)

Police Commander Robert Kerkorian was the shift commander on duty at the time Centeno's emergency call came in. (Kerkorian Dep. at 7:22-24.) He first learned of the situation some time after 11:00 p.m. from Police Commander Wayne Walles, who met Kerkorian at the police station and informed him that a man armed with a large kitchen knife had barricaded himself inside a pantry at a private residence.[3] (*Id.* at 8:2-4; 10:19-22.) Kerkorian asked Walles to keep him informed, and Walles reported to the scene where he observed Burleson, who was just then beginning her attempt to communicate with Roberto. (Walles Dep. 10:12-14:18.) After a few minutes, Walles phoned Kerkorian and again described the situation. Walles also told Kerkorian that the department's deputy chief, Artis Yancey, had authorized the deployment of the Rapid

---

[3] In several separate depositions, members of the Rapid Response Team stated that they had been informed by superiors, dispatchers, or other officers that Roberto Gonzalez was armed with a knife. As noted, Jose Gonzalez claims he told police officers on the scene that Roberto was unarmed, and Roberto himself told Sergeant Burleson that he had no knife. It is therefore unclear where the information that Roberto was armed with a knife had its genesis.

Response Team to address the situation. (Kerkorian Dep. at 9:1-15.)[4]

Kerkorian, who is a senior member of the Rapid Response Team, immediately notified the other team members at the police station and ordered them to gather their gear and report to Gonzalez's address. (*Id.* at 12 2:8.) Kerkorian then drove to the residence, where he was met by Walles, who reported that Burleson was still attempting a dialogue with Roberto. Walles and Kerkorian were then joined by Deputy Chief Yancey, and the men discussed the "emergency plan," a contingency plan to be used if it suddenly became necessary for the Rapid Response Team to enter the pantry for the safety of Roberto or others. (Walles Dep. at 27:7-19.) The plan called for officers to break a small first-floor exterior window that gave access to the pantry. (*Id.* at 27:21-22.) Officers would then fire several "pepperballs" –pellets containing a debilitating chemical powder that is similar to pepper spray–through the small window into the pantry. (*Id.* at 27:22-24.) A team inside the house would then breach the pantry door and restrain Roberto. (*Id.* at 27:24-28:1; Kerkorian Dep. at 15:14-16.)

Kerkorian was in command of the operation, and he devised the emergency plan. (Walles Dep. at 27:10-11; Kerkorian Dep. at 14:18-15:1-22.) He also instructed all of the members of the Rapid Response Team as to their role in the plan. (*Id.* at 14:9-17.) After discussing the plan with Walles, Kerkorian entered the house and spoke with Sergeant Burleson. (*Id.* at 16:7-10.) Kerkorian testified that Burleson confirmed that "she did talk to the family or officers had talked to the family" and that family members had advised police that Roberto had no history of mental illness or drug use. (*Id.* at 16:16-19.) According to Kerkorian, Burleson also told him "that [Roberto] had a large kitchen knife [and] that he was acting crazy." (*Id.* at 16:23-24.) Kerkorian took up a post outside of the house near the driveway, where he could give further orders via radio to officers

---

[4]     Yancey has since become Chief of the Waukegan Police Department. Yancey's testimony is not in the record and it is unclear from Walles' testimony when and how he obtained Yancey's authorization for deployment of the Rapid Response Team.

positioned at the external window and officers positioned inside the kitchen.

Detective Alejos Villalobos, a member of the Rapid Response Team, was posted to a ladder outside of the small first-floor window to the pantry, armed with a pepperball gun. (Villalobos Dep. 14:4-15:13, 9:2-17.)[5] According to Villalobos, two other Rapid Response Team members, Officers Michael Newman and Mark Sturtevant, were posted on the ground near the ladder in order to provide cover and support. (*Id.* at 13:16-14:6.)[6] Villalobos testified that, from his position on the ladder, he could partially see through the window into the pantry where Roberto was sequestered. (*Id.* at 15:10-14.) Villalobos did not have a clear view of Roberto, however, because the window was covered on the inside by a semi-translucent piece of plastic. (*Id.* at 15:15.) Officer Newman, who also claimed to have been up on the ladder, described the plastic as "some sort of wax paper film." (Newman Dep. at 12:17-18.) "We could see shapes and movement [through the plastic]," Newman said, "but we couldn't make anything out." (*Id.* at 12:18-19.) Like Newman, Villalobos admitted that he could only make out indistinct silhouettes inside the pantry. (Villalobos Dep. at 15:24.)

As he waited beside the window, Villalobos testified, he saw Roberto briefly lean his head against the plastic covering. The contact with Roberto's head left a red smudge on the plastic that

---

[5] At the time of his deposition, Villalobos could not remember how far from the ground the window was. Nor did he indicate how far his position on the ladder was from the window. He did say that the ladder was leaning against the external wall of the house. Officer Newman estimated that the window was between six and eight feet off the ground. (Newman Dep. 12:17-19.)

[6] There are inconsistencies in the testimony of the officers stationed outside of the window about who was posted where and when. Newman testified that he, not Villalobos, was up on the ladder. Newman also said he thought that, at some point, Sturtevant might have been on the ladder as well. (Newman Dep. at 13:15-20.) Sturtevant testified that he was never on the ladder, but that both he and Villalobos were kneeling on the ground some five to eight feet from the window for the duration of the standoff. (Sturtevant Dep. at 11:1-4, 15:1.) Sturtevant did not indicate who, if anyone, was posted on the ladder.

Villalobos, who claims he was right outside the window, immediately recognized as blood.[7] (*Id* at 34:20-35:5.) Villalobos then saw Roberto make several jerky thrusting motions with his hands and arms toward his neck. (*Id.* at 35:20-21.) Villalobos could not tell what exactly was in Roberto's hands, but he thought he saw an object that might have been a knife and he "assumed" that Roberto was stabbing himself. (*Id.* at 36:6-24.) Villalobos admitted, however, that the thrusting was unaccompanied by any noises, such as screaming, or any further indication of blood spatter. (*Id.* at 36:22-23.) Officer Newman also testified that he saw the thrusting motion, though in Newman's version, he, rather than Villalobos, was up on the ladder. (Newman Dep. at 17:5-23; 19:17-19.) Officer Sturtevant claimed to have seen the knife distinctly, as well, though he testified that he was kneeling on the ground beside the ladder, presumably well below the window. "The knife looked like a big butcher knife that you would cut big steaks with," Sturtevant said, "I guess a chef's knife would be the best way to describe it." (Sturtevant Dep. at 14:11-14.) Sturtevant is the only officer who claims that he ever actually saw a knife in Roberto's possession at any time during the incident.[8]

Either Sturtevant or Newman then yelled to Commander Kerkorian, who was about fifteen feet away in the driveway, that it appeared that Roberto was stabbing himself. (Sturtevant Dep. at 15:4-17; Newman Dep. at 19:13-16; Kerkorian Dep. at 22:5-11.) Kerkorian immediately gave the order to prepare to enter the pantry. (Kerkorian Dep. at 20:10-13.) Approximately one minute later, he ordered the implementation of the emergency plan. (*Id.*) Newman–who testified that he was

---

[7] Again, Villalobos's testimony conflicts with that of Sturtevant, who testified that both he and Villalobos were kneeling on the ground when Roberto's head became visible. (Sturtevant Dep. at 14:20-15:1).

[8] Sturtevant's contention is arguably inconsistent with Newman's testimony that the window was six to eight feet off the ground and covered with plastic film. (Newman Dep. at 12:4-19.) Newman testified that he was unable to make out shapes through the window from the ground unless "they were up on the window," and that he could only obtain a view inside by climbing the ladder and looking in from a "downward angle." (*Id.* at 14:5-14.)

still on the ladder at this point–smashed a hole in the top part of the window, and Villalobos fired seven pepperball rounds through the broken window into the interior ceiling of the pantry. (Newman Dep. at 21:10-23; Villalobos Dep. at 37:8-21.)

Officers Steven Hollister, Anthony Joseph, Devin Roush, Edward Heidler, and Commander Walles—all specially-trained members of the Rapid Response Team—were inside the house near the pantry door when Kerkorian gave the order to enter the pantry and subdue Roberto. Officer Heidler first tried to force the door open. He succeeded in pushing the door open a small crack, but the door was strongly barricaded by an object behind it. Heidler was soon overcome by the debilitating fumes of the pepperball rounds, which caused a burning sensation in his eyes, nose, and throat, and made it difficult for him to breathe. (Heidler Dep. at. 12:12-21; 16:11-23.) Observing that Heidler was overcome, Walles ordered Heidler to leave the house immediately to get fresh air. (*Id.* at 17:3-6.) Officers then took turns using a battering ram to strike the door, but the door remained well barricaded and opened only slightly. (Rouse Dep. at 17:1-5.) Officer Rouse moved to a position where he could see Roberto inside the pantry through the narrow opening at the door. (*Id.* at 17:10.) Rouse saw that Roberto was holding a piece of cloth up to his mouth, flailing his arms, and pacing back and forth in the pantry. (*Id.* at 17:12-14; 18:21-23.) Rouse was uncertain whether Roberto had anything else in his hands, but he did not see a knife in Roberto's possession. (*Id.* at 17:19-18:2; 32:18-20.) Rouse did not see any stab wounds on Roberto or any injuries on Roberto's face, and Rouse could not recall seeing any blood on Roberto's clothing. (*Id.* at 32:13-23.)

Rouse shouted verbal commands at Roberto, including an order directing Roberto to lie on the ground, but because he was wearing a gas mask that covered his mouth, Rouse admitted that Roberto might have been unable to understand him. (*Id.* at 20:3-13.) Rouse's gas mask then began malfunctioning and he too was overcome by the pepperball fumes. (*Id.* at 20:3-22.) He began coughing and had difficulty breathing and seeing. (*Id.*) He removed his mask and continued

attempting to shout commands that Roberto surrender and lie on the ground. (*Id.*) Because his eyes were burning from the fumes, Rouse could not see what happened when other officers finally breached the pantry door. (*Id.* at 25:22-23.)

Officer Joseph kicked in the pantry door. (Joseph Dep. at 16:10-11.) It took several minutes, and Joseph had to kick the door more than 40 times before the door finally fell from its hinges. (*Id.* at 16:20-24.) Officer Hollister recalled that Roberto was standing immediately behind the door, no more than six inches away from him when the door came down. (Hollister Dep. at 22:3-5; 23:17-20.) According to Hollister, Roberto was facing the officers with his right hand tucked under his sweatshirt. (*Id.* at 22:20-22.) Hollister ordered Roberto to show his hands, but then waited "less than a second" for Roberto to comply before he raised his ballistic shield and rushed Roberto, pinning Roberto to an object or wall inside the pantry. (*Id.* at 24:3-23; 25:10-19.) Roberto continued to struggle and push against the shield. (*Id.* at 27:3-7.) According to Hollister, he kept Roberto pinned upright for roughly 45 seconds, while Officer Joseph reached around the shield with his taser gun and shocked Roberto. (*Id.* at 36:2-8; 28:10-24.) Hollister could not remember how many times the taser was used.

Joseph's recollection differs from Hollister's in certain respects. According to Joseph, Roberto was not standing, but lying on his stomach on top of a baker's rack when the officers entered the pantry. (Joseph Dep. at 21:15-23:6.) Joseph stated that he initially attempted to restrain Roberto, but Roberto began flailing his arms and legs wildly. (*Id.* at 21:21; 24: 4-19.) Hollister then pinned Roberto down on the backer's rack with his ballistic shield, and Joseph pressed the taser directly against Roberto's body and fired. Joseph testified that he used the taser on Roberto twice, once between Roberto's shoulder blades and once on his lower back, but Roberto did not show any signs of pain or other physical response to the taser. (*Id.* at 30:15:22; 31:1-20.) After further struggle, Hollister and Joseph successfully placed Roberto in handcuffs. Neither Joseph nor Hollister had been wearing gas masks, and once Roberto was securely

handcuffed, Joseph rushed out of the house because the pepperball fumes were making it difficult for him to breathe. (*Id.* at 44:3-18.) When Joseph reentered the house a few minutes later, one of the other officers informed him that Roberto had lost consciousness. (*Id.* at 44:8-9.)

Officer Elias Aglianos, who was also in the kitchen that night, recounted a very different version of the officers' entry into the pantry. Aglianos testified that he had been setting up a perimeter outside of the house, but he rushed into the kitchen as the door was being kicked in. He took up a position behind Officer Hollister, who had paused in the pantry doorway with his ballistic shield raised in order to prevent Roberto from rushing the officers. (Aglianos Dep. 24:7-11.) Aglianos heard other officers repeatedly yelling at Roberto to "show us your hands." (*Id.* at 24:10-13.) Aglianos's gas mask began to fog, so he removed it. (*Id.* at 24:16-18.) He felt some effects of the pepper fumes, but he could nevertheless clearly see Roberto standing roughly six feet away when the door was taken down. (*Id.* at 24:6-24; 26:5-8.) According to Aglianos, Roberto "faced away from [the officers] and had his arms clenched within his body very tightly." (*Id.* at 24:13-15.) Roberto said nothing; instead, he was "just standing, facing the wall with his arms held in tight." (*Id.* at 24:22-24.) Aglianos could not see anything in Roberto's hands and did not recall seeing any blood or noticing any injuries on Roberto. (*Id.* at 25:2-3; 26:15-21.) As the officers advanced toward Roberto and again ordered him to show them his hands, Roberto remained rigid, facing the wall without moving–essentially passive–and making no attempt to strike, push, or threaten any of the officers. (*Id.* at 30:9-19; 58:1-20.) When Roberto failed to comply with the officers' orders to show his hands, Officer Joseph pressed his taser directly against Roberto's back and fired. (*Id.* at 31:10-24.) Roberto flinched in an apparent pain response to the taser, but he made no move to back up or turn toward the officers. (*Id.* at 32:1-10.) Aglianos could not recall how many times Joseph fired the taser. (*Id.* at 32:19-20.) He testified that Roberto eventually dropped to his knees, and Joseph and Hollister were able to wrench Roberto's arms free and handcuff Roberto's hands behind his back. (*Id.* at 33:7-23; 34:4-21.) The officers then pulled Roberto from the pantry, and

Aglianos realized that Roberto's body was limp and his eyes were closed. (*Id.* at 35:21-22; 36:10-13.) There is no evidence that Roberto did, in fact, have a knife in his possession. None of the officers testified to recovering a knife from inside the pantry.[9]

After Roberto was pulled unconscious from the pantry, someone called for Officer Newman, who is a trained paramedic. (Newman Dep. at 26:1-16.) Newman rushed into the kitchen, where he found Roberto lying unconscious on the floor. (*Id.* at 27:5-22.) Newman checked Roberto's vital signs; Roberto had no pulse and was not breathing. (*Id.* at 28:1-4.) Newman began administering CPR, but he soon stopped and requested help moving Roberto outside because Newman himself was having trouble breathing due to the pepperball fumes. (*Id.* at 28:11-18.) Some officers (Newman couldn't remember which ones) carried Roberto outside, where Newman and other paramedics on the scene resumed administering CPR to Roberto. (*Id.* at 30:15-24, 31:1-17.) Newman testified that he observed cuts on Roberto's face; he did say how deep or fresh these cuts were. (*Id.* at 32: 9-14.) After several minutes administering CPR, paramedics took Roberto to the hospital, but Roberto died without regaining consciousness. (*Id.* at 32:3-8.)

According to Nancy Jones, the forensic pathologist who performed Roberto's autopsy on January 4, Roberto's death was caused by "excited delirium due to cocaine intoxication." (Jones Dep. 32:15-16.) Toxicology reports showed that Roberto's system contained substantial quantities of metabolized cocaine and a particularly dangerous chemical mixture of cocaine and alcohol. (*Id.* 45:3-48:11.) Jones explained that cocaine-induced delirium is marked by irrational behavior, hallucinations, paranoia, and increased rates of cardiac and respiratory activity. (*Id.* at 33:8-24.)

---

[9] The investigative report compiled by the Lake County Major Crime Task Force after the incident indicates that a broken knife handle and blade were found "lying on the floor," but the report does not indicate whether the handle and blade were inside the pantry or on the kitchen floor. (Investigative Report, Ex. B to Pl.'s 56.1 Stat.) No witness testified to recovering a knife, and it does not appear that any member of the Lake County Task Force was deposed in connection with this case. There has been no authentication or foundation that would permit the court to consider the Task Force report as evidence at this stage in the litigation.

In Jones's opinion, "stress due to restraint [was] a significant contributing factor to [Roberto's] death." (*Id.* at 43:15-18.) Jones explained that when someone is experiencing delirium as Roberto was, "by restraining them, you feed into their paranoia and their fear . . . so you can actually release more epinephrine or the adrenaline into their system thereby creating more of a problem." (*Id.* at 44:1-4.) Jones went on to say, however, that, given the levels of cocaine in Roberto's system, it was "very likely" that Roberto would have ultimately died of overdose regardless of whether he was confronted and restrained by police. (*Id.* at 44:11-22.) Plaintiff has not presented expert medical testimony to rebut that conclusion. Roberto had no stab wounds on his neck, chest, or shoulders. He did have four electrical burn patterns on his back that were consistent with receiving shocks from a taser. (*Id.* at 20:1-3.) Jones said that she could not conclusively determine exactly how many times Roberto had been shocked, but that it could have been anywhere from one to four times. (*Id.* at 21:2-6; 24:24.) Roberto also had several recent blunt trauma injuries and internal hemorrhaging. Jones identified over 30 separate cuts and bruises on Roberto's body, including: (1) a one inch cut on his left temple, (2) a 1.25 inch laceration on his left eyebrow, and (3) numerous bruises on Roberto's fingers, back, and buttocks. (Jones Dep. Ex 1 at 051-053.) Jones stated that these injuries "could have happened while Mr. Gonzalez was banging around in the pantry, fighting with his family, fighting with police." (*Id.* at 28:3-8.)

The Defendant officers maintain that their actions with regard to Roberto Gonzalez were reasonable under the circumstances. They also claim that they are shielded from any potential liability by qualified immunity. The court now turns to its consideration of these arguments.

## DISCUSSION

### I.     Summary Judgment Standard

A motion for summary judgment shall be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P.

56(c). When ruling on a summary judgment motion, the court accepts all admissible evidence presented by the nonmoving party and draws all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). The court does not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence on summary judgment. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The function of summary judgment is to determine whether there is a genuine issue for trial and "to isolate and dispose of factually unsupported claims." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); *Hemsworth*, 476 F.3d at 490. Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court considers Defendants' motion with these standards in mind.

## II.    Excessive Force

Defendants first seek summary judgment on Plaintiff's excessive force claims because, Defendants contend, every individual officer involved acted in an objectively reasonable manner in seizing and subduing Roberto Gonzalez. The Fourth Amendment governs analysis of a claim that a law enforcement officer employed excessive force in the performance of her duties. *Marion v. City of Corydon,* 559 F.3d 700, 705 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). Whether the force used to effect a seizure is excessive depends on the totality of the circumstances. *Id.* "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397(quoting *Scott v. United States*, 436 U.S. 128, 137 (1978)). This inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. The calculus must make allowances "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

If, after considering the totality of the circumstances, a court determines that a law enforcement officer's behavior was objectively reasonable as a matter of law, summary judgment is appropriate. *Abdullahi*, 423 F.3d at 770. As the Seventh Circuit has observed, however, "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly.'" *Id.* at 773 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Haynes v. Village of Lansing*, 656 F. Supp. 2d 783, 791 (N.D. Ill. 2009) ("[W]here 'the facts draw into question the objective reasonableness of the police action under the alleged circumstances,' the court should deny summary judgment to allow for the further development of disputed facts concerning the propriety of the force used in relation to the apparent threat posed by the arrestee.") (internal citation omitted). In this case, while summary judgment is clearly appropriate with regard to some of the individual Defendants who played no meaningful role in the incident, there remain several unresolved factual questions that prevent the court from granting Defendants' motions for summary judgment in their entirety.

### A.    Defendants Walles, Thomas, Newman, Sturtevant, Heidler and Roush

It is undisputed that Officers Thomas, Newman, Sturtevant, Heidler, Rouse, and Commander Walles did not use excessive force against Roberto Gonzalez. Plaintiff has voluntarily withdrawn its excessive force claims against those officers. This is proper. Section 1983, which creates a cause of action for participation in an alleged constitutional deprivation, is predicated upon personal liability and fault. 42 U.S.C. § 1983*; Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). A person cannot be held liable under the section unless he himself caused or participated in the constitutional violation. *Id.*

The court concludes that Plaintiff's state law claims against these individuals should also

be dismissed.[10]  Under Illinois law, battery is the unauthorized touching of another that offends a reasonable sense of personal dignity.  *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008.) Plaintiff concedes that these officers did not engage in offensive contact with Roberto Gonzalez. The undisputed facts show that Newman and Sturtevant were posted outside of the house for the entire incident.  Neither officer ever made physical contact with Gonzalez, that is, until Newman was called upon to administer CPR.[11]  Officer Thomas did not even arrive at the scene of the incident until Gonzalez was already being treated by paramedics.  (Thomas Dep. at 8:10-14.)  Heidler was overcome by fumes and ordered out of the house before the officers entered the pantry. Commander Walles and Officer Roush were present during the incident, but their roles were primarily observational and neither man ever came near to Gonzalez.  Accordingly, the court grants Defendants' motion for summary judgment in part.  All claims against Defendants Walles, Thomas, Newman, Sturtevant, Heidler, and Roush are dismissed.

## B.  Defendant Villalobos

It is similarly undisputed that Defendant Villalobos had no physical contact with Gonzalez. His role in the incident involved firing seven rounds of non-lethal pepperball pellets through a small

---

[10]  Understandably, the parties' briefs focus on Plaintiff's Fourth Amendment claim rather than the state battery claim.  Nevertheless, summary judgment on the state law claims is appropriate here.  *See Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009) (where there is no genuine issue of material fact and the evidence and rationale supporting the state and federal claims are identical, summary judgment may be appropriate as to the state claims even where the parties' arguments have focused almost exclusively on the federal claims.) Given the evidence, a battery action cannot be maintained against these Defendants under any theory.  In addition to conceding that there was no physical contact between these Defendants and the decedent, Plaintiff cannot demonstrate the "willful or wanton conduct" required to support liability under the Illinois Tort Immunity Act, 745 ILCS 10/2-202.

[11]  Administering CPR to an unconscious patient in a bona fide medical emergency is the paradigmatic example of an *implied consent* situation and cannot support a battery claim.  *See* RESTATEMENT (SECOND) OF TORTS §829 D.  Interestingly, with respect to the larger facts of this case, Comment a. to that section also states: if a "party is attempting to commit suicide, this Section does not give a privilege to use force to prevent him, but a privilege may exist under §§ 140-145 (privilege to use force or impose restraint for the purpose of preventing the commission of a crime)."

window into the pantry where Gonzalez was holed up. This act does not give rise to liability for use of excessive force. Villalobos had been informed by his superiors that Gonzalez was armed with a knife, and he observed Gonzalez move his hands in several rapid thrusting motions to his neck and shoulders. Based on this information, Villalobos reasonably believed that Gonzalez was acting to harm himself. Other officers near Villalobos's position also saw Gonzalez's movement and drew the same conclusion. Villalobos's view was partially obscured by the semi-translucent plastic over the window, and he had no way of disaffirming his assumption that Gonzalez was stabbing himself.

Though Villalobos ultimately proved mistaken in that Gonzalez did not, in fact, stab himself, his actions appear reasonable under the circumstances and calculated to prevent what he believed was an immediate harm. Emergency police actions that might otherwise offend the Fourth Amendment are often acceptable when motivated by a good-faith belief that they are necessary to prevent imminent harm or loss of life. *See, e.g., United States v. Hughes*, 993 F.2d 1313 (7th Cir. 1993) (report of woman and child in danger sufficient for warrantless police entry into suspected crack house); *United States v. Holloway,* 290 F.3d 1331 (11th Cir. 2002) (anonymous 9-1-1 call sufficient to search a private residence); *United States v. Barone*, 330 F.2d 543 (2nd Cir. 1964) (overheard screams sufficient to justify entry into a residence). Here, Villalobos witnessed what he thought was the escalation of a life-threatening emergency. Kerkorian then ordered Villalobos to fire the pepperball gun, a non-lethal weapon, into the pantry in accordance with a prearranged plan to protect Gonzalez and other police officers. Villalobos stated that he deliberately fired the pellets into the ceiling in order to avoid any chance that he might inadvertently hit and harm Gonzalez.

Villalobos could not have known that his observations were faulty, and he likely could not have anticipated the further use of force that ensued when other officers stormed the pantry. Instead, Villalobos reasonably anticipated that the pellets would work as planned to incapacitate Gonzalez, either forcing Gonzalez to surrender or creating an opportunity to apprehend Gonzalez with a minimal risk of harm. Villalobos acted reasonably as a matter of law. The claims against him

are dismissed.

### C. Defendants Aglianos, Joseph, and Hollister

The evidence establishes that Defendants Aglianos, Joseph, and Hollister all played a substantial role in storming the pantry and physically seizing Gonzalez. All three Defendants admitted to applying some level of force to effect the seizure. Hollister pinned Gonzalez with a ballistic police shield. Aglianos testified that he put his leg somewhere "between [Gonzalez's] legs, lower back, or shoulders" to prevent Gonzalez from turning around to face the officers. (Aglianos Dep. at 21:1-18.) Joseph acknowledged that he used his taser twice on Gonzalez. The officers also stated that they struggled with Gonzalez before finally being able to handcuff him. This level of force, the officers contend, was objectively reasonable. Given the unresolved factual questions as to the circumstances surrounding this use of force, however, the court cannot presently conclude that these Defendants acted reasonably as a matter of law.

There is a factual dispute about the amount of force Defendants exerted over Gonzalez. Plaintiff contends that the officers actually applied far greater force than they now admit. First, with respect to the taser, Plaintiff points to the fact that the medical examiner identified not two, but four, electrical burn patterns on Gonzalez's back. This testimony, by itself, is not inconsistent with Joseph's assertion that he fired only twice; the medical examiner explained that four burns could be consistent with between one and four uses of the taser. Other officers could not remember how many times the taser was used, however, and Officer Aglianos acknowledged that, though he could not remember how many times Gonzalez had been tasered, it was plain to him that Gonzalez was experiencing some pain in response to the taser. Officer Hollister indicated that at least 45 seconds elapsed while Gonzalez was firmly immobilized, pinned by a police shield, and tasered multiple times. Precisely what effect the taser gun had on Gonzalez and whether its use (either two or four times) was reasonable in these circumstances are questions of fact, the determination of which requires credibility judgments and the weighing of evidence. Such judgments are not the province

of this court on summary judgment.

In addition to the taser injuries, Plaintiff notes, the autopsy revealed that Roberto had many fresh cuts and bruises on his body, caused by blunt trauma. His autopsy also revealed substantial hemorrhaging in the soft tissue of his face and neck, which the medical examiner said might be consistent with being hit and choked.[12] (Jones Dep. at 27:15-18.) Rouse and Aglianos testified that they did not see cuts on Roberto's face or recall any visible injuries to Roberto prior to the officers' entry into the pantry. Yet Officer Newman later saw cuts on Roberto's face, while delivering CPR to Roberto. Particularly in circumstances like these, where Gonzalez is not available to offer his version of events, circumstantial evidence of recent injury permits the possible inference that Gonzalez sustained bodily harm as a result of the officers' application of force. *See Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal value to direct evidence and in some cases even more reliable.") Of course, Gonzalez was heard thrashing about in the pantry. His injuries may very well have been self-inflicted, or they may be the result of an earlier struggle with Jose. These reasonable possibilities do not, however, preclude the possibility that the Defendants inflicted some of Gonzalez's wounds. The extent to which the actions of police officers were a "contributing factor" to Gonzalez's death, as the medical examiner concluded, is also a factual question that cannot be conclusively resolved at this stage.[13]

---

[12]    The medical examiner did not offer an opinion that Gonzalez had in fact been choked. She noted that the hemorrhaging in Gonzalez's neck might also be consistent with insertion of the tracheal tube that Gonzalez received from paramedics. At best, the examiner's testimony indicates that the cause of the hemorrhaging was indeterminate; whether the hemorrhaging was caused by being choked or by the delivery of necessary medical treatment is a question of fact on which reasonable finders of fact might disagree.

[13]    Notably, while Jones stated that the force exercised by the Defendant officers "may have resulted in [an] extra dose of the epinephrine being released and just pushing [Roberto] over the edge," she concluded that Roberto would have "very likely" ultimately died from an overdose regardless of what the officers did. (Jones Dep. 44:1-22.) If Jones is correct that Roberto's death was inevitable, Plaintiff's compensatory recovery will be limited to the conscious pain and suffering Roberto experienced prior to his death. *See Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1190 (continued...)

Even if the court were capable of conclusively discerning exactly how much force the Defendants officers employed, summary judgment would still be inappropriate at this stage as there are important questions about the reasonableness of the officers' actions that remain unanswered. In *Graham,* the Supreme Court set out a non-exhaustive list of factors that it considered particularly relevant to such an analysis. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. At the time of the standoff, police were not aware of any crime that Roberto Gonzalez had committed. Gonzalez was alone in an isolated room in his own home. He appeared to be mentally unstable and in need of medical attention. Though officers claim to have been told that Roberto Gonzalez was armed with a knife, Jose Gonzalez testified that he told officers on the scene that his brother was not armed. Jose also testified that Roberto had not threatened anyone. Roberto himself told Sergeant Burleson that he had no knife. While Roberto Gonzalez was in obvious distress when he barricaded himself inside the pantry, there was little to suggest that Gonzalez was dangerous to others. Assuming Defendants were legitimately concerned for Gonzalez's own well-being when officers witnessed what they believed to be Gonzalez stabbing himself, those concerns abated when Defendants kicked down the door and saw Gonzalez inside alive and well. Officer Roush testified that he had a clear view of Gonzalez even before the door was fully opened, yet the officers apparently failed to pause even briefly to confirm whether Gonzalez was indeed harming himself before storming the pantry with shield and taser drawn.

---

[13](...continued)
(7th Cir. 1985) (in actions for violations of federal rights that result in death, the decedent's estate "may recover damages for loss of life, conscious pain and suffering experienced by the decedent prior to death, and punitive damages in a case in which the standard [of reckless or callous indifference] has been satisfied."); *see also Carter v. Chicago Police Officers*, 165 F.3d 1071, 1082 (7th Cir. 1998) (affirming a jury award of $50,000 for decedent's pain and suffering resulting from use of excessive force).

If Officer Aglianos's version of events is to be believed, Gonzalez did not necessarily pose an immediate danger to the officers once they kicked down the door. Gonzalez had his back turned toward the officers and was completely unresponsive to their presence. While he failed to immediately comply when instructed to show his hands, Gonzalez made no threatening motions, statements, or gestures toward the officers. He did not actively resist or attempt to flee from the officers. He merely stood facing the wall with his arms tucked tightly into his body. He was in a small room that was filled with debilitating pepperball fumes—fumes that would have made it difficult for him to see and to breathe—the mere proximity of which had already incapacitated several trained police officers. A reasonable trier of fact could conclude from these circumstances that Gonzalez's manner was not threatening and that his capacity to do harm to the officers was negligible. Yet the Defendants advanced on Gonzalez, restrained him, and shocked him more than once with a taser at point blank range. Gonzalez fell to his knees. After a struggle, he was handcuffed. He eventually lost consciousness and died on the scene. Viewing these facts in the light most favorable to Plaintiff, the court cannot presently conclude that Defendants Aglianos, Joseph, and Hollister acted reasonably as a matter of law. The motion for summary judgment is therefore denied as to the claims against Defendants Aglianos, Joseph, and Hollister.

**D.    Defendant Kerkorian**

It is undisputed that Commander Kerkorian did not personally use any force against Gonzalez. Kerkorian was commanding the Rapid Response Team from his location on the driveway when the team breached the pantry. He never made any physical contact with Gonzalez. Nevertheless, Plaintiff maintains that Kerkorian should be liable for facilitating and ordering the use of excessive force against Gonzalez, as Kerkorian developed the emergency plan to enter the pantry and ultimately gave the order to execute the plan.

"There is no principle of a supervisors' liability, either in tort law generally or in the law of constitutional torts. To be held liable for conduct of their subordinates, supervisors must have been

personally involved in that conduct." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (internal citations omitted). For liability to attach, a supervisor must have acted either knowingly or with deliberate reckless indifference to facilitate, approve, condone, or to turn a blind eye toward constitutional abuses committed by the officers under his command. *Id.* at 992-93.

The facts do not support an inference that Commander Kerkorian knowingly or recklessly ordered the use of excessive force against Gonzalez. Sergeant Burleson had told Kerkorian that Gonzalez was armed with a knife. Officers Newman and Sturtevant told Kerkorian that they had observed Gonzalez apparently stabbing himself. Given this information, Kerkorian ordered the deployment of pepperballs and an entry into the pantry. Those orders appear reasonable under the circumstances, motivated as they were by Kerkorian's informed belief that the actions were necessary to prevent immediate harm to Gonzalez. Kerkorian was not present in the room when the door was breached—as Officers Aglianos, Hollister, and Joseph were—to determine that Gonzalez had not, in fact, stabbed himself. Nor was Kerkorian capable of witnessing Gonzalez's behavior and making a determination as to the potential threat Gonzalez presented and the amount of force necessary to effect his apprehension. Kerkorian did not advise officers Aglianos, Joseph, or Hollister on how much force to employ in seizing Gonzalez; the decision to use force and what level of force to use was left within the discretion of the individual officers.[14] Kerkorian did not order Officer Hollister to strike Gonzalez with a ballistic shield. He did not order Officer Joseph to taser Gonzalez. Given Kerkorian's limited personal role in the application of actual force and his lack of knowledge or recklessness with regard to the use of force, the claims against Kerkorian are dismissed.

----

[14]     For instance, several officers were armed with firearms, to be used should any individual officer determine that lethal force was necessary. Joseph was armed with at least two non-lethal options, the taser and a special shotgun that fired beanbags, which he was empowered to use at his discretion. Joseph testified that he decided that the shotgun was not necessary based on the circumstances.

The court now turns to Defendants' qualified immunity argument.

**III.    Qualified Immunity**

Defendants' second contention is that the doctrine of qualified immunity shields all of the Defendant Officers from liability for their actions with regard to Gonzalez.  "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Accordingly, an officer is to be shielded from liability when clearly established law does not show that his actions violated the Fourth Amendment.  *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct 808, 822 (2009).  To defeat a defense of qualified immunity, therefore, a plaintiff must demonstrate both (1) that an officer's conduct violated the plaintiff's constitutional rights, and (2) that the violated right was clearly established at the time of the alleged misconduct.  *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009) (citations omitted).

As explained in the previous section,  Defendants Thomas, Newman, Sturtevant, Heidler, Rouse, Walles, Villalobos, and Kerkorian did not engage in conduct that amounted to excessive force or otherwise violated Gonzalez's constitutional rights.  Having dismissed the claims against these Defendants on their merits, the court need not further consider the defense of qualified immunity as it applies to them.  With regard to Defendants Aglianos, Joseph, and Hollister, the answer to the first prong of the qualified-immunity test hinges on several fact questions that should be determined by the jury.  The only remaining issue, then, is whether those Defendants violated a "clearly established" legal right.

Defendants point out that the use of non-lethal weapons, including tasers, has been upheld as lawful when deployed to protect an officer's safety in tense and uncertain situations.  *See, e.g., Dye v. Lomen*, 40 Fed.Appx. 993, 996 (7th Cir. 2002) (prisoner who was tasered by guards after struggling and refusing instructions was not subject to excessive force)*; Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (deputy who tasered a driver who was belligerent and threatening toward him during a traffic stop employed reasonably proportionate force).  Defendants' focus on

the legality of non-lethal weapons in the abstract misunderstands the purpose of the qualified immunity analysis, however. *Draper* and *Dye* do not stand for the proposition that the use of non-lethal force is always constitutional *per se*.[15] As the Seventh Circuit has repeatedly recognized and explained, use of non-lethal weapons can be "exaggerated and excessive," removing police action from the protection of qualified immunity. *See, e.g., Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (the legality of tear gas or other non-lethal chemical agent depends upon the appropriateness of the use under the circumstances); *Lewis*, 581 F.3d at 479 (no qualified immunity for prison guard who used a taser on a prone and docile inmate). To determine whether the qualified immunity defense is available, the court must assess whether, operating under the state of the law as it existed at the time of the relevant events, a reasonable officer would have known that the particular action at issue was unlawful. *Id.* at 479.

As already stated, Officer Aglianos's testimony suggests that Gonzalez did not actively resist, attempt to flee, or threaten the officers in any way. His description presents Gonzalez as unresponsive, but essentially passive, facing toward the wall away from the officers. While it is undisputed that Gonzalez failed to comply with the officers' instructions, there is no evidence that Gonzalez was warned about the consequences of his noncompliance. It is unclear whether Gonzalez even had the capacity to comply with commands, given his disturbed mental state and prolonged exposure to debilitating pepperball fumes. Though the officers had been told that Gonzalez might be armed with a knife and that Gonzalez had apparently stabbed himself, Aglianos's testimony permits the inference that the officers had the time and opportunity to observe that Gonzalez was, in fact, unhurt and unarmed. Assuming that the facts ultimately show that the officers

---

[15]     *Draper* and *Dye* also appear distinguishable on their facts. In those cases, the suspect explicitly threatened and actively resisted law enforcement officers. Suspects were given adequate warnings before being shocked, and the plaintiffs were apparently unharmed by use of the taser. In contrast, Officer Aglianos testified that Gonzalez was not clearly even aware of the officers' presence and did not threaten the officers in any way.

were capable of determining that Gonzalez was unarmed and posed no immediate threat to himself or the police officers, Defendants are not entitled to qualified immunity. In those circumstances, a reasonable officer would have known that forcibly restraining Gonzalez, an evidently disturbed but innocent individual, shocking him multiple times with a taser, and potentially inflicting other blunt trauma injuries upon his person would be plainly excessive and unlawful. *See McDonald by McDonald v. Haskins,* 966 F.2d 292, 294-95 (7th Cir. 1992) (a "precisely analogous" case is not required to defeat a defense of qualified immunity where the circumstances permit the conclusion that a given display of force was obviously gratuitous); *Haynes*, 656 F. Supp. 2d at 792 (repeated use of a taser on a suspect who was unarmed and apparently posed no threat to officers precluded finding officers protected by qualified immunity on summary judgment). Defendants' motion for summary judgment is denied as to claims against Defendants Aglianos, Joseph, and Hollister.

## IV. The City of Waukegan

Plaintiff asserts no independent claim against the City of Waukegan under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Instead, Plaintiff asserts only that the City is liable under a *respondeat superior* theory on its state law claims. The City's motion does not present an independent argument on its own behalf, but instead "relies on this court granting summary judgment in favor of all the individual police officer Defendants." (Def. Mot. at 1.) Because state law claims of tortious assault and battery survive against Defendants Aglianos, Joseph, and Hollister, the City's motion must be denied.

## CONCLUSION

For the foregoing reasons, Defendant City of Waukegan's motion for summary judgment [51] is denied. The court grants Defendants' motion for summary judgment [50] with respect to all claims against Defendants Thomas, Newman, Sturtevant, Heidler, Rouse, Walles, Villalobos, and Kerkorian, and the court denies the motion with respect to all claims against Defendants Aglianos, Joseph, and Hollister.

ENTER:

Dated: March 3, 2010

_____
REBECCA R. PALLMEYER
United States District Judge